**Joanne HVAMSTAD, individually and d/b/a Lolita's Rap Parlor, Plaintiff,**

**v.**

**Frederick SUHLER, in his official capacity as City Attorney for the City of Rochester; Raymond S. Schmitz, in his official capacity as County Attorney for the County of Olmsted; and Hubert H.**

**Humphrey III, in his official capacity as Attorney General for the State of Minnesota, Defendants.**

**No. 3–89 CIV 462.**

United States District Court, D. Minnesota, Third Division.

Dec. 29, 1989.

---

Randall D.B. Tigue, Minneapolis, Minn., for plaintiff.

Frederick S. Suhler Jr., City Atty. for Rochester, Minn., pro se.

Richard S. Slowes, Asst. Sol. Gen., St. Paul, Minn., for defendant Hubert H. Humphrey, III.

## FINDINGS OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

ALSOP, Chief Judge.

The above entitled matter came before the court on December 1, 1989 on plaintiff's motion for summary judgment. Plaintiff had previously filed a motion for a preliminary injunction that was suspended pending the present decision on the merits. Both parties agree there are no genuine issues of fact. Therefore, based upon the arguments and memoranda of counsel, and upon all of the files, records, and proceedings herein, the court hereby makes the following findings of undisputed facts and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff JoAnne Hvamstad is a citizen of the United States and the State of Minnesota. She resides at 2003 Southwest 2nd Street in the City of Rochester, County of Olmsted, Minnesota. As part of the same building in which she resides, she operates Lolita's Rap Parlor.

Defendant Frederick Suhler is the City Attorney for Rochester, Minnesota. Defendant Raymond F. Schmitz is the County Attorney for Olmsted County, Minnesota. Defendant Hubert H. Humphrey III is the Attorney General of the State of Minnesota. In their respective capacities, each defendant's duties include bringing actions for temporary and permanent injunctive relief under *Minn.Stat.* §§ 617.80–87. The statute authorizes the defendant public officials to bring an action to close a building for one year as a public nuisance when there have been a specified number of convictions for prostitution, gambling, or related offenses that occur on the property. The statute reads in pertinent part:

617.81 Nuisance; acts constituting; injunctions; notice.

Subd. 1. Injunction. In order to obtain a temporary injunction under section 617.82 or a permanent injunction or order of abatement under section 617.83, the provisions of section 617.80–617.87 must be followed.

Subd. 2. Acts constituting a nuisance. For purposes of section 617.80–617.87, a public nuisance exists upon proof of any of the following:

(1) three or more misdemeanor convictions or two or more convictions, of which at least one is a gross misdemeanor or felony, within the previous two years for acts of prostitution or prostitution-related offenses committed within the building;

(2) three or more misdemeanor convictions or two or more convictions, of which at least one is a gross misdemeanor or felony, within the previous two years for acts of prostitution or gambling-related offenses committed within the building; or

(3) two or more convictions within the previous two years for keeping or permitting a disorderly house within the building.

Subd. 3. Notice. Notice of a conviction described in subdivision 2 must be mailed by the court administrator to the owner of the building where the offense was committed and all other interested parties and must be filed with the county recorder's office. This notice is considered sufficient to inform all interested parties that the building or a portion of it is being used for purposes constituting a public nuisance.

617.82 Temporary order. Whenever a city attorney, county attorney, or the attorney general has cause to believe that a nuisance described in section 617.81, subd. 2, exists within the jurisdiction the attorney serves, that attorney may by verified petition seek a temporary injunction in district court in the county in which the alleged public nuisance exists. No temporary injunction may be issued without a prior show cause notice of hearing to the respondents named in the petition and an opportunity for the respondents to be heard. Upon proof of a nuisance described in section 617.81, subd. 2, the court shall issue a temporary injunction. Any temporary injunction issued must describe the conduct to be enjoined.

617.83 Injunction; order of abatement. Upon proof of a nuisance described in section 617.81, subd. 2, the court shall issue a permanent injunction and enter an order of abatement. The permanent injunction must describe the conduct permanently enjoined. The order of abatement must direct the closing of the building or a portion of it for one year, except as otherwise provided in section 617.84 or 617.85, unless sooner released pursuant to section 617.87. Before an abatement order is enforced against a building or portion of it, the owner must be served with the abatement order and a notice of the right to file a motion under section 617.85 in the same manner that a summons is served under the Rules of Civil Procedure. A copy of the abatement order shall also be posted in a conspicuous place on the building or affected portion. . . .

617.87 Release of property. If, after an order of abatement has been entered, the owner appears and pays the costs of the action and files a bond in an amount determined by the court, but not to exceed $50,000, conditioned that the owner will immediately abate the nuisance for a period of one year, the court may, if satisfied of the owner's good faith, order the release of the building or portion of it which is subject to the order of abatement. If the premises are released, for each day during the term of the bond that the owner knowingly permits any part of the premises to be used for any activity which was the basis of the abatement order, the owner shall forfeit $1,000 under the bond. Forfeiture under the bond does not relieve the owner from prosecution for contempt. Release of the property pursuant to this section does not release it from an injunction issued under section 617.83 or any other judgment, penalty, lien, or liability to which it may be subject by law.

During 1988, Sandra Loser and Rhonda White entered pleas of guilty to offenses of misdemeanor prostitution committed at Lolita's Rap Parlor. On June 30, 1989 Sheila Bell entered a plea of guilty to misdemeanor prostitution committed at Lolita's Rap Parlor.

Plaintiff had actual knowledge of the arrests, charges, and convictions shortly after each happened. Plaintiff knew about the first arrest for prostitution on December 19, 1987. She learned that a conviction had resulted on the day the guilty plea was entered. Plaintiff knew of the second arrest and charge of prostitution at Lolita's Rap Parlor in July or August of 1988, one or two days after the arrest. She knew that the defendant had been convicted one or two days after the guilty plea. Plaintiff learned about the third arrest for prostitution at her business in January 1989, one or two days after it occurred. She learned of the conviction one or two days after the guilty plea, which was entered on June 30, 1989.

On February 3, 1988 defendant Suhler publicly announced that he intended to

bring action under *Minn.Stat.* §§ 617.-80–.87 to close down any and all premises in which three or more prostitution convictions take place. In light of the above facts, plaintiff seeks a declaratory judgment that the statute is unconstitutional on its face and as applied.

## II. CONCLUSIONS OF LAW

### A. *Facial Challenges*

#### 1. In General

■ The plaintiff first challenges the constitutionality of *Minn.Stat.* §§ 617.80–87 on its face. As a general rule, "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). However, the Supreme Court in *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), noted two situations where one can make an facial challenge to a statute:

> To prevail on a facial attack the plaintiff must demonstrate that the challenged law either "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties."

*Id.* (citations omitted).

The first of these challenges does not involve a departure from the standing rule. *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796–797, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984). Nor is facial attack on the ground that the statute is unconstitutional in every application limited to challenges based upon the first amendment. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (where the Court addressed the constitutionality of the Bail Reform Act).

The second kind of facial challenge, on the other hand, is an exception to the ordinary standing requirements, and

[i]s justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power.

*New York State,* 108 S.Ct. at 2233. The theory behind the first amendment "overbreadth doctrine" is that litigants are permitted to challenge a statute even though it may not be unconstitutional as applied to them, because there has been a judicial prediction that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973). The Court has not recognized an overbreadth doctrine outside the limited context of the first amendment. *Salerno,* 481 U.S. at 745, 107 S.Ct. at 2100.

The Supreme Court has noted that the overbreadth doctrine is "strong medicine" and consequently has placed some limits upon it. 413 U.S. at 613, 93 S.Ct. at 2916–17. An overbreadth challenge will not succeed unless "the statute is *'substantially'* overbroad which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized first amendment protections of parties not before the Court.'" *New York State,* 108 S.Ct. at 2233.

#### 2. Freedom of Association

##### a. *Valid applications of the statute*

■ In the case at hand it is clear Hvamstad cannot successfully challenge the Minnesota statute on the grounds it is unconstitutional in every application. The crux of plaintiff's first amendment claim is that the statute potentially punishes innocent landowners for illegal conduct that occurs on their property. Plaintiff argues that the statute allows the state to close down property where prostitution or gambling occurs, regardless of whether the landowner was aware of this conduct, and that this in turn infringes upon landowners' freedom to associate with whom they please. She sees the nuisance statute as penalizing landowners not for their own conduct, but rather solely for their associa-

tion with others who engage in unlawful conduct.

Plaintiff correctly argues that the Supreme Court has limited the extent to which persons may be criminally punished or subjected to civil liability for the unlawful behavior of their associates.[1] Unfortunately, these cases are inapposite to her claim. The statute provides that landowners will receive notice of the convictions after they occur, enabling them to curtail any illegal conduct on the land. Thus, it is apparent that the statute is not unconstitutional in all applications. Section 617.80 *et seq.* could constitutionally be applied to landowners who receive notice of the conduct occurring on the property and fail to address this problem. These landowners would be required to close down their property for a year not because of the crimes of their associates, but because of their own failure to ensure criminal conduct does not occur on that property.[2]

### b. *Overbreadth and freedom of association*

The Supreme Court has referred to constitutionally protected "freedom of association" in two distinct senses. In *Roberts v. United States Jaycees,* 468 U.S. 609, 617–618, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 the Court outlined its past analysis in association cases:

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human-relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the first amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion....

The *Roberts* Court observed that expressive and intimate association rights may coincide, especially where the state interferes with individuals' selection of those with whom they wish to join in a common endeavor. *Id.* at 618, 104 S.Ct. at 3249–50. Still, the Court said that the "nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case." *Id.* As a result, the Court considered separately the effect of the statute at issue in *Roberts* on individuals' freedom of intimate association and their freedom of expressive association.

### i. Intimate association

■ Following this method of analysis, the court first addresses plaintiff's overbreadth challenge based upon the statute's alleged infringement of intimate association. As noted earlier, the Supreme Court

---

1. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Sawyer v. Sandstrom,* 615 F.2d 311, 317 (5th Cir.1980); *Keyishian v. Board of Regents of the University of the State of New York,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *see also Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).

2. The Third Circuit confronted a similar freedom of association argument in *Trade Waste Management Ass'n v. Hughey,* 780 F.2d 221 (3d Cir.1985). There a New Jersey statute regulating waste disposal provided that hazardous waste disposal facilities had to be registered and licensed by the state. The statute required disclosure of the criminal history of those involved in the company and provided a facility could be disqualified if, *inter alia,* someone involved in the enterprise had prior convictions or a bad reputation. *Id.* at 237. In finding these provisions did not violate plaintiffs' freedom of association rights the court stated: "The plaintiffs urge that intimate associations are involved because ... the disclosure and disqualification requirements will have a chilling effect upon familial relationships. Construing the disqualification provision as the state recommends, it does not, as the plaintiffs' argument suggests, permit disqualification because a member of an applicant's family was once convicted of a crime or has a bad reputation. Disqualification will occur only because of the conviction or bad reputation of some person participating in the enterprise in a significant manner." Similarly, in the case at hand, a property can be adjudicated a nuisance not because the landowner associates with felons, but because certain illegal acts are committed on that property.

has refused to extend the overbreadth doctrine beyond the realm of the first amendment.[3] While the Court has described the expressive association right as stemming directly from the first amendment,[4] the same cannot be said of the right of intimate association. Rather, its constitutional bases are somewhat amorphous. As the Court observed in *Board of Directors of Rotary Int'l v. Rotary Club:*

> The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights. Such relationships may take various forms, including the most intimate.... We have not attempted to mark the precise boundaries of this type of constitutional protection. The intimate relationships to which we have accorded constitutional protection include marriage, ... the begetting and bearing of children, ... child rearing and education, and cohabitation with relatives.

481 U.S. 537, 545, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) (cites omitted); *see also Roberts*, 468 U.S. at 619, 104 S.Ct. at 3250.

The Supreme Court has not addressed whether the overbreadth doctrine, normally limited to the first amendment area, nevertheless applies to the right of intimate association. In *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1193 (9th Cir.1988), the court commented that it was "uncertain whether one can facially challenge a statute on the grounds that it violates the right of intimate association" because "[n]one of the decisions cited in *Roberts* as establishing this right, 468 U.S. at 619, 104 S.Ct. at 3250, involved such a challenge."

Given the limited scope of the overbreadth doctrine and the Supreme Court's analysis of the foundations of the freedom of association, this court concludes that one cannot launch an overbreadth attack based upon the freedom of intimate association. As noted earlier, the Court has not only refused to extend the overbreadth doctrine beyond the first amendment context, but has also sparingly administered this "strong medicine" in first amendment cases.[5] In addition, the Court, while noting the two types of association may overlap, has concluded that the two must be analyzed separately because "protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249–50. The rationale behind the overbreadth doctrine, a judicial prediction that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression,[6] necessarily extends to the freedom of expressive association because

> [a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the state unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.

*Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252. The overbreadth doctrine, in its limited state, cannot however be extended to encompass intimate association rights that are based not on first amendment concepts, but on general liberty notions. Consequently, the court finds the plaintiff, being unable invoke the overbreadth doctrine in this area, lacks standing to facially challenge the law's effect on intimate association rights.

■ Moreover, even if Hvamstad could facially challenge the statute on intimate

---

**3.** *See Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100.

**4.** "The right to engage in activities protected by the first amendment implies a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Board of Directors of Rotary Int'l v. Rotary Club*, 107 S.Ct. at 1947.

**5.** *See Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973) where the Court stated that "[a]pplication of the overbreadth doctrine ... is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort."

**6.** *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

association grounds, the court would find the statute constitutional. To begin with, it is questionable whether the statute interferes with intimate associations. The plaintiff urges that intimate associations are involved because the statute will have a chilling effect on relationships. However, the statute does not allow for abatement because one has friends or family who have committed crimes. Instead, the property can be closed for a year because the landowner did not prevent further acts of prostitution or gambling on the property. In addition, the statute cannot be said to be "substantially" overbroad; any chilling effect on intimate association that may occur because of the statute is simply too remote and speculative to be a basis for holding the statute unconstitutional.[7]

### ii. Expressive association

Hvamstad can, nonetheless, rely on the overbreadth exception to the standing requirement to assert the statute unconstitutionally impedes freedom of expressive association. Plaintiff's claim in the expressive association context is, however, somewhat nebulous. First, plaintiff carefully framed her constitutional attack to avoid a claim that the statute violates individuals' freedom of speech or association because it allows the state to close businesses involved in speech-related activities like rap parlors and bookstores. Plaintiff apparently does this because any attack upon this basis would clearly fail in light of the Supreme Court's recent decision in *Arcara v. Cloud Books*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). *Arcara* involved a constitutional challenge to a similar New York statute which authorized closure of a building found to be a public health nuisance because it was being used as a place for prostitution and lewdness. *Id.* at 699, 106 S.Ct. at 3173. The owner of a bookstore that was closed down because prostitution occurred on the premises challenged the statute on first amendment grounds.

The Court, in finding the statute constitutional, concluded that "the first amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 707, 106 S.Ct. at 3177.

Instead, plaintiff bases her attack on the theory that the statute punishes individuals solely because of the behavior of those with whom they associate and thus interferes with their freedom of association. At the same time, however, in response to the *Roberts* case, she argues that the underlying nature of her business, i.e. a rap parlor where conversation is provided for a fee, carries with it elements of the expressive association right. In effect, plaintiff in the same breath asks the court to interpret her constitutional challenge as limited to the intimate association right and to find the statute impedes expressive association rights because of the potential effect on rap parlors or other speech-related businesses. Plaintiff cannot have her cake and eat it too. Any interference with first amendment-related businesses caused by the Minnesota statute parallels that of the statute in *Arcara*. And, applying *Arcara*, the court concludes that the first amendment is not implicated by the enforcement of this public health regulation of general application against physical premises in which first amendment activity occurs. *Id.* 478 U.S. at 707, 106 S.Ct. at 3177-78.

Additionally, had the *Arcara* decision been inapplicable, the court could not conclude that the statute is "substantially overbroad." *See Broadrick*, 413 U.S. 601, 93 S.Ct. 2908. The statute is not directed toward limiting the groups to which one can belong[8] or forcing one to accept unwanted members into a group.[9] Any effect this statute has on expressive rights is indirect and incidental to its goal of eliminating public nuisances.[10] Therefore the

---

7. *See, e.g., Trade Waste Management, supra,* note 2.

8. *See, e.g., Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).

9. *See, e.g., Roberts,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252.

10. *See Trade Waste Management, supra* n. 2.

court finds an overbreadth challenge to this statute would fail.

### 3. Procedural Due Process

■ Plaintiff also argues that the Minnesota statute is unconstitutional on its face, in that it provides a nuisance is presumed upon the showing that the requisite number of convictions occurred. She contends that because the statute does not allow a landowner to question the underlying validity of these convictions, it violates procedural due process. Because a facial challenge based on overbreadth is limited to the first amendment context, Hvamstad's due process challenge must be grounded on the theory that this provision of the statute is unconstitutional in all applications.

It is well established that the due process clause at a minimum requires "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). Under the statute, landowners receive both notice and an opportunity to be heard. Section 617.82 provides that no injunction can be issued without a prior show cause *notice of hearing to the landowner and an* opportunity for the landowner to be heard. Section 617.83 further provides that upon proof of a nuisance as defined in the statute, the court shall issue a permanent injunction and enter an order of abatement. Thus, it is clear that the statute requires a hearing where the landowner has an opportunity to prove that there were no alleged convictions for crimes described in the statute and occurring on the owner's property. Such a hearing satisfies due process requirements.

The plaintiff incorrectly asserts that the statute violates due process because it does not allow landowners to contest the validity of the underlying convictions. The legislature, in outlining the number of crimes necessary to automatically invoke the statute, was simply making a judgment under its police power as to what constitutes a nuisance. Such a legislative determination is subject to challenge only if no reason-ably conceivable set of facts could establish a rational relationship between the statute and a legitimate end of government. *See, e.g., United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938). The legislature could properly conclude that convictions of prostitution or gambling on property are sufficient evidence that the property has become a nuisance. Consequently, plaintiff's due process facial challenge to *Minn.Stat.* §§ 617.80 *et seq.* must also fail.

### 4. Equal Protection

■ Plaintiff next urges the nuisance statute is unconstitutional because its broad sweep permits arbitrary and capricious police enforcement. This claim must fail because it is based on speculative application of the statute to others, in circumstances not presented by this case. Therefore, as this claim does not fall within the first amendment exception to the standing rule, Hvamstad lacks standing to bring it.

### B. *Constitutionality as Applied*

#### 1. Freedom of Association

■ Plaintiff also argues that the statute, as applied to her, violates her freedom of association. As noted above, the statute is not unconstitutional in all applications because it could be constitutionally applied to one who had knowledge of the convictions for prostitution occurring on their property. Plaintiff had actual knowledge of the arrests for prostitution at issue in this case. She knew of the first arrest on December 19, 1987, the second in July or August of 1988, and the third in January 1989. Adopting the court's analysis in the facial overbreadth section, it is clear that the statute could constitutionally be applied to plaintiff. The statute would penalize her not for the wrongs of her associates, but for her failure to rid her property of this nuisance.

In addition, it is questionable whether any intimate association right is involved in plaintiff's case. The Supreme Court has acknowledged that there exists a continuum of human relationships potentially protected by the freedom of intimate association. In *Roberts* they described the level of protection afforded different relation-

**520**

ships in connection with the sanctity of those relationships:

> Family relationships, by their nature, involve deep attachments and · commitments ... Among other things, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the state's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees....
>
> Between these poles, of course, there lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the state.

468 U.S. at 619–20, 104 S.Ct. at 3250–51 (cites omitted).

The relationships for which plaintiff claims she is being penalized are her relationships with the three women who were convicted of prostitution at the plaintiff's business—Lolita's Rap Parlor. She has produced no evidence to demonstrate that these relationships were of the variety the Court has recognized as entitled to protection based on intimacy. Indeed, presumably these relationships are simply employment relationships. In any event, plaintiff's relationship with the women fall far from the familial relationship end of the intimate association continuum and thus are not entitled to the same degree of constitutional protection. In light of the state's interest in regulating nuisances, application of this statute to plaintiff would not be unconstitutional.

### 2. Procedural Due Process

■ The court's analysis of Hvamstad's facial challenge based on procedural due process is also applicable to her challenge to the statute as applied. In the event that the state seeks to close plaintiff's property under the statute, she will receive notice and an opportunity to be heard on the question of whether there were the requisite number of convictions for prostitution occurring on her property. The statute further provides that after an order of abatement has been entered, the court, if satisfied of the owner's good faith, can release the property if the owner pays costs and posts a bond promising to abate the nuisance for one year. Clearly these provisions satisfy plaintiff's minimum due process rights.

Accordingly,

IT IS HEREBY ORDERED That:

1. Plaintiff's summary judgment motion for a declaratory judgment that *Minn.Stat.* §§ 617.80–.87 is unconstitutional on its face and as applied is DENIED;

2. The Clerk of Court shall enter judgment as follows:

> IT IS ORDERED, ADJUDGED AND DECREED That the complaint of plaintiff Joanne Hvamstad, individually and d/b/a Lolita's Rap Parlor is DISMISSED in its entirety and that she have and recover nothing by her action.